UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| ARIN MOORE,<br>    *Plaintiff*,<br><br>  v.<br><br>ANDREW M. SAUL, Commissioner of the<br>Social Security Administration,<br>    *Defendant*. | Civil No. 1:19-cv-0650-CMH-MSN |

## REPORT AND RECOMMENDATION

This matter comes before the Court on the parties' cross-motions for summary judgment (Dkt. Nos. 10 and 12). Plaintiff Arin Moore seeks judicial review of the final decision of defendant Andrew M. Saul, Commissioner of the Social Security Administration, denying her claim for disability insurance benefits and supplemental security income under Title II of the Social Security Act, 42 U.S.C. § 423 (the "Act"). Alternatively, plaintiff moves for an order remanding the instant appeal to the Social Security Administration ("SSA") for a new administrative hearing pursuant to § 405(g). For the reasons stated below, the undersigned Magistrate Judge recommends that plaintiff's Motion for Summary Judgment (Dkt. No. 10) be GRANTED, that defendant's Cross-Motion for Summary Judgment (Dkt. No. 12) be DENIED, and that the matter be remanded to the Social Security Administration for a new administrative hearing.

  **I.**  **Background**

Plaintiff applied for disability insurance benefits on November 6, 2014, and for supplemental security income on May 15, 2015, alleging that she was disabled by epilepsy beginning on January 10, 2014. Administrative Record ("AR") at 72, 80, 91, 103. Plaintiff's application was initially denied on July 16, 2015, and again upon reconsideration on May 25, 2016.

*Id.* at 88, 114. At plaintiff's request, a hearing was held on March 6, 2018, before Administrative Law Judge ("ALJ") Thomas J. Sanzi, at which plaintiff appeared in person in Washington, D.C., the ALJ appeared by video teleconference, and a Vocational Expert ("VE") testified via telephone. *Id.* at 49. On April 4, 2018, the ALJ issued a decision finding that plaintiff was not disabled under the Act through the date of the decision. *Id.* at 26-35. The Appeals Council found no error and denied review on March 21, 2019, making the ALJ's decision the final decision of the Commissioner. *Id.* at 1-6.

Having exhausted her administrative remedies, plaintiff filed a Complaint (Dkt. No. 1) on May 28, 2019, challenging the ALJ's decision. Plaintiff filed a Motion for Summary Judgment (Dkt. No. 10) on November 1, 2019, including a Memorandum in Support of Plaintiff's Motion for Summary Judgment (Dkt. No. 11), to which the Commissioner filed a Cross-Motion for Summary Judgment (Dkt. No. 12) on November 1, 2019, along with a Memorandum in Support (Dkt. No. 13). On November 15, 2019, the plaintiff filed a Memorandum in Opposition to Defendant's Motion for Summary Judgment. (Dkt. No. 15). On November 15, 2019, the defendant filed a Memorandum in Opposition to Plaintiff's motion for Summary Judgment. (Dkt. No. 16). Accordingly, the parties' motions are ripe for disposition.

**II.     Evidence before the ALJ**

Below is a summary of plaintiff's testimony before the ALJ, the VE testimony, medical evidence of plaintiff's impairment, and state agency opinion evidence.

**a.  Plaintiff's Testimony at the Administrative Hearing**

On March 6, 2018, plaintiff's administrative hearing commenced. The hearing began with the ALJ's examination of the plaintiff. Plaintiff discussed her transportation options, noting that she is unable to drive due to her seizures. AR at 52, 63. When she has money, she uses a ride-

sharing service for transportation, otherwise she walks. *Id.* at 53. Her boyfriend drove her to the hearing in Washington, D.C., and plaintiff planned to walk home. *Id.* at 53. Plaintiff testified she had a high school education and obtained a Certified Nursing Assistant certification. *Id.*

The plaintiff then testified about her work history. At the time of the hearing, plaintiff was working for Fairfax County Schools on a part-time, irregular basis. Plaintiff's job with the school system consisted simply of riding with children to and from school. *Id.* at 55. Plaintiff had some trouble remembering the details of prior employment because of an imperfect memory "due to the seizures." *Id.* at 56. Plaintiff and the ALJ next discussed her prior employment at Macy's, where she worked one-on-one with customers in purchasing items in the jewelry department. AR at 56. This employment was also part time with variable hours, never exceeding 25 hours per week. Plaintiff stated that she worked at Macy's until she had two seizures on the job. Prior to that, plaintiff worked at a Dunkin' Donuts franchise but could not remember her hours of employment. AR at 58. Plaintiff testified that the job ended because she had a seizure while working, went to the hospital, and was then told she could no longer work at the store. AR at 58. The ALJ then asked plaintiff about her employment at McDonald's, where she worked as a cashier. Similarly, the plaintiff testified that she was told not to return to work after having a seizure while working. AR at 58.

The ALJ then asked plaintiff to describe what prevents her from working. Plaintiff testified that she has both grand mal and petite seizures. The petite seizures cause her to feel unable to speak or move, lightheaded, nauseous, and overheated. The grand mal seizures cause pain throughout her entire body analogous to a charley horse, severe headaches that are nonresponsive to treatment, memory loss, and unresponsiveness. AR at 62. Plaintiff testified that she had seizures "practically all my life," but did not understand that they were a medical problem until 2014. Plaintiff testified

3

that her last grand mal seizure had been a week prior to the hearing, and her last petite seizure had been the night before the hearing. AR at 60. Plaintiff testified that the frequency of these seizures was unpredictable; she could go months without having one and then have four in the span of a week. AR at 60. The ALJ then asked plaintiff about her treatment. Plaintiff testified that *currently* she was prescribed two medications, but only one of the medications was covered by her insurance, and she was unable to afford the other due to her low income. AR at 61. No testimony was elicited regarding the nature of or plaintiff's adherence to prescribed medications in 2016. AR at 60-61. Plaintiff testified that she had an MRI performed in 2016 which showed a hole in her brain due to the seizures, and that she had another MRI a month prior to the hearing which showed that the hole had grown larger. Plaintiff testified that her neurologist told her she was unable to "do anything," and that she has had at least one seizure every month for the last three months prior to the hearing. AR at 63.

### b. VE Testimony at the Administrative Hearing

The ALJ then heard testimony from the VE. The VE assessed that plaintiff's jobs at McDonald's and Dunkin' Donuts were light exertion jobs at a low skill level, and that her current role with the Fairfax schools was a light, semi-skilled position. AR at 66. The ALJ then posed a hypothetical with some minor limitations, positing a person of the claimant's background and experience who is able to perform work at all exertional levels and never able to climb ladders, ropes or scaffolds, frequently able to climb stairs or ramps, balance, stoop, crouch, kneel and crawl, but must avoid exposure to machinery and unprotected heights. The VE testified that such a person could perform plaintiff's past relevant work, as well as other jobs in the national economy such as cashier, laundry worker, and assembler. AR at 67. The VE then testified that such a person would be precluded from work under a wide range of additional limitations, such as being unable to work

consistently more than four hours a day, being absent from work two days a month, and being off task for 15% of the work period. AR at 67.

Plaintiff's attorney then gave a closing statement. He stated that plaintiff met the requirements of section 11.02 of the Listing of Impairments, given that she had a seizure every month for the past three months due to her epilepsy. AR at 68. He reiterated that plaintiff's employment history demonstrated a clear pattern of being unable to hold down positions due to her condition. AR at 68. The ALJ then asked about the consistency of plaintiff's treatment. Her attorney stated that she had been treated consistently and that she had recently started a new medication, but nothing had stopped the seizures. AR at 69. The hearing then concluded.

### c. Medical Evidence of Physical Impairment

Throughout the relevant period, plaintiff was treated by neurologist Dr. Tajammul Ehsan. The first visit listed in the record occurred on November 24, 2013. AR at 359. At this visit, plaintiff told Dr. Ehsan that she saw a doctor in March 2012, went to the emergency room on September 23, 2013, and had 1-2 episodes every six months during which she "lo[]ses time." Tr. 358. An EEG was abnormal and suggested a generalized seizure disorder. AR at 362. Plaintiff's next visit was in February 2014, at which Dr. Ehsan again noted her abnormal EEG and discussed plaintiff's uncertainty about going on medication. AR at 356. On May 15, 2015, plaintiff saw Dr. Ehsan again and reported she had two seizures the week prior to the appointment. AR at 354. Plaintiff agreed to take medication and started on lamotrigine. At her next visit in June, plaintiff said she had stopped taking medication. AR at 351.

In December 2014, plaintiff was hospitalized following a petit mal seizure. Plaintiff reported that she had experienced a seizure every month for the past six months. Plaintiff was instructed to be compliant with her medication. AR at 371. In February 2015, plaintiff stated she

had been having seizures every two weeks, despite taking medication. That spring, plaintiff was living in a shelter and had seizures on February 27, March 3, March 8. AR at 419. The record indicates she was on Depakote and Keppra at this time. AR at 418. At her appointment with Dr. Ehsan on July 2, 2015, plaintiff reported she had seven seizures between March 19, 2015, and May 2, 2015. AR at 427. The following month, after forgetting to take one of her seizure medications, plaintiff went to the emergency room after experiencing two seizures within fifteen minutes, each lasting five minutes. AR at 432.

Plaintiff returned to the emergency room again on September 8, 2015, experiencing chest pain and left arm pain. AR at 470. Plaintiff next saw Dr. Ehsan on December 24, 2015, and reported having run out of medication. AR at 424. Plaintiff reported four seizures in December. AR at 424. Plaintiff had five seizures in January 2016, two seizures in February 2016, ten seizures in March 2016, and at least one seizure in April 2016. AR at 478, 540.[1] At an April emergency room visit, the record states that plaintiff had been complaint with her medication. AR at 478. In a phone consult with hospital staff on April 14, plaintiff's treating physician said there was no need for a medication change at that time, but that several different seizure medications had proven ineffective for her. AR at 483. Plaintiff was hospitalized from April 29 to May 3, 2016, for treatment of epilepsy. AR at 557-58. The record indicates that plaintiff had to go to the emergency department for treatment of seizures five times in the two months prior to that visit. AR at 558. The same record also indicates that plaintiff was having breakthrough seizures despite treatment with Keppra and Zonegram. AR at 558.

---

[1] These seizures are discussed in the records from plaintiff's hospital visits during this time period, which occurred on March 4, March 31, April 5, April 14, and starting April 29. AR at 502, 517, 538, 478, 540. In addition to the records themselves, some of these seizures are corroborated by other means as well, for example a seizure at work, which the record reflects was witnessed by her coworker, AR at 518, and seizures corroborated by her boyfriend. AR at 484.

6

Plaintiff again saw Dr. Ehsan on July 27, 2017, where she reported she had run out of medication and continued to have seizures in her sleep. AR at 625. During this visit, Dr. Ehsan assessed that plaintiff was unable to hold down a job due to severe epilepsy and was a fall risk. AR at 622.

### d. State Opinion Evidence

Dr. Richard Surrusco, M.D., a State agency medical consultant at the initial level, reviewed the record evidence and opined that despite the frequency of her seizures, plaintiff did not meet a listing due to "lack of consistent medication compliance." AR at 75, 83. Dr. Surrusco noted that plaintiff sometimes went off medications for cost reasons, or because of lack of insurance. AR at 75, 83. While Dr. Surrusco did assign some limitations, he ultimately determined plaintiff had the residual function capacity to work.

Upon reconsideration, Dr. Robert Mogul reviewed the evidence in the record and likewise highlighted plaintiff's lack of consistent medication compliance. AR at 97-98. Like Dr. Surrusco, Dr. Mogul opined that the plaintiff could work at all exertional levels but should only frequently balance, stoop, kneel, crouch, crawl, or climb ramps/stairs, and never climb ladders, ropes, or scaffolds. AR at 97-98, 109-10. Dr. Mogul also added the limitation that plaintiff should avoid moderate exposure to heights and hazards due to her condition. AR at 97-98, 109-10. Nevertheless, Dr. Mogul opined that plaintiff had the residual functional capacity to work.

## II. Disability Evaluation Process

The Social Security Regulations define "disability" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). To meet this definition, the

claimant must have a severe impairment that makes it impossible to do past relevant work or any other substantial gainful activity ("SGA") that exists in the national economy. *Id.*; *see also Heckler v. Campbell*, 461 U.S. 458, 460 (1983). Determining whether an applicant is eligible for disability benefits under the SSA entails a "five-part inquiry" that "asks: whether (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a medical impairment (or combination of impairments) that are severe; (3) the claimant's medical impairment meets or exceeds the severity of one of the impairments listed in [the SSA's official Listing of Impairments]; (4) the claimant can perform [his] past relevant work; and (5) the claimant can perform other specified types of work." *Hines v. Barnhart*, 453 F.3d 559, 562 (4th Cir. 2006). Before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's residual functional capacity ("RFC"), meaning the most that the claimant can do despite his or her physical or mental limitations. C.F.R. §§ 416.920(h), 416.945(a)(1).

### a. The ALJ's Decision

On April 4, 2018, the ALJ issued a decision finding plaintiff not disabled and denying her application for benefits. AR at 26-34. Under the first step, the ALJ found that plaintiff had engaged in substantial gainful activity from October 2017 with her job at the Fairfax County Schools. AR at 28. Plaintiff had also engaged in substantial gainful activity from October 2016 through December 2017. AR at 28. While plaintiff had engaged in substantial gainful activity during some periods, there was a continuous twelve-month period during which plaintiff did not engage in substantial gainful activity, and so the ALJ continued his analysis. AR at 29.

At step two, the ALJ found that plaintiff had the severe impairment of seizure disorder. At step three, the ALJ found that plaintiff's impairment did not meet or medically equal the severity of one of the impairments listed in the SSA's official Listing of Impairments. AR at 29. The ALJ

first considered Listing 11.02A, which refers to "generalized tonic-clonic[2]. . . occurring at least once a month for at least 3 consecutive months . . . despite adherence to prescribed treatment." The ALJ dispensed with this Listing in a single sentence, stating "claimant acknowledged she was not taking all of the medications she was prescribed." AR at 29. The ALJ went on to address Listing 11.02C, opining that there was no evidence that plaintiff's seizures occurred at least once every two months for at least four consecutive months despite adherence to prescribed treatment and "a marked limitation in one of the following: physical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself." AR at 29.

Before proceeding to steps four and five, the ALJ determined plaintiff's RFC. After considering plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms, and other evidence in the record, the ALJ concluded that plaintiff has the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations: frequently climb ramps and stairs; never climb ladders, ropes, and scaffolds; frequently balance, stoop, crouch, kneel, and crawl; and avoid all use of moving machinery and all exposure to unprotected heights. AR at 29.

Under step four, the ALJ found that plaintiff is able to perform her past relevant work as a fast food worker, companion, and counter attendant. AR at 33. The ALJ found that "there are jobs that exist in significant numbers in the national economy that claimant can perform" given her age, education, work experience, and RFC. AR at 33. These jobs included laundry worker, cashier, and

---

[2] Generalized tonic-clonic seizures are characterized by loss of consciousness accompanied by a tonic phase (sudden muscle tensing causing the person to lose postural control) followed by a clonic phase (rapid cycles of muscle contraction and relaxation, also called convulsions). Tongue biting and incontinence may occur during generalized tonic-clonic seizures, and injuries may result from falling. 20 C.F.R. § 404 Subpt. P, App'x 1, at § 11.00(H)(1)(a).

assembler. AR at 33-34. *Id.* Based on the foregoing analysis, the ALJ concluded that plaintiff was not disabled as defined by the Act. *Id.*

### III. Standard of Review

In reviewing a decision of the Commissioner, district courts are limited to determining whether the Commissioner's decision was supported by substantial evidence on the record, and whether the proper legal standard was applied in evaluating the evidence. *See* 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see also Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). It "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws*, 368 F.2d at 589. When evaluating whether the Commissioner's decision is supported by substantial evidence, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Secretary." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1996). "Ultimately, it is the duty of the [ALJ] reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence." *Id.* (citing *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)). If supported by substantial evidence, the Commissioner's findings as to any fact are conclusive and must be affirmed. *See* 42 U.S.C. § 405(g); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971).

Although the standard is high, when the ALJ's determination is not supported by substantial evidence on the record or when the ALJ has made an error of law, the district court must reverse the decision. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). In evaluating whether the ALJ made an error of law, the Fourth Circuit applies a harmless error analysis in the

context of social security disability determinations. *See Mascio v. Colvin*, 780 F.3d 632, 639 (4th Cir. 2015). The harmless error doctrine prevents a remand when the ALJ's decision is "overwhelmingly supported by the record though the agency's original opinion failed to marshal that support" and a remand would be "a waste of time." *Williams v. Berryhill*, 2018 WL 851259, at *8 (E.D. Va. Jan. 18, 2018) (citing *Bishop v. Comm'r of Soc. Sec.*, 583 Fed. App'x 65, 67 (4th Cir. 2014) (per curium)). An ALJ's error may be deemed harmless when a court can conclude on the basis of the ALJ's entire opinion that the error did not substantively prejudice the claimant. *See Lee v. Colvin*, 2016 WL 7404722, at *8 (E.D. Va. Nov. 29, 2016). When reviewing a decision for harmless error, a court must look at "[a]n estimation of the likelihood that the result would have been different." *Morton-Thompson v. Colvin*, 2015 WL 5561210, at *7 (E.D. Va. Aug. 19, 2015) (citing *Shineski v. Sanders*, 556 U.S. 396, 411-12 (2009)).

**IV.    Analysis**

Plaintiff argues that the ALJ failed to properly evaluate plaintiff's impairments at step three of the sequential evaluation process. Pl. Br. (Dkt. No. 11) 2. Defendant responds by asserting that the ALJ's decision is supported by substantial evidence in the record. Def. Br. (Dkt. No. 13) 14. For the reasons that follow, the undersigned recommends granting plaintiff's Motion for Summary Judgment, denying defendant's Cross-Motion for Summary Judgment, and remanding the final decision of the ALJ with respect to the ALJ's failure to explain why plaintiff did not satisfy the requirements of Listing 11.02.

Step three of the evaluation process requires the ALJ to consider whether the plaintiff has a condition that meets or equals the requirements of a listed impairment. To be found disabled under a listed impairment, plaintiff must present medical findings that either meet all of the criteria for a listed impairment or are equal in severity to all of the criteria for the most similar listed

11

impairment. 20 C.F.R. §§ 404.1526, 416.926. Under Listing 11.02, epilepsy is disabling if documented by a detailed description of a typical seizure and characterized by the criteria present in subsection A, B, C, or D of the Listing. 20 C.F.R. § 404 Subpt. P, App'x 1, at § 11.02. Subsection A simply requires that a plaintiff must manifest "generalized tonic-clonic seizures, occurring at least once a month for at least 3 consecutive months despite adherence to prescribed treatment." *Id*. If this straightforward requirement is met, then the plaintiff is disabled *per se.*

In explaining his determination that the plaintiff did not meet the requirements of Listing 11.02A, the ALJ seemingly did not dispute that plaintiff was experiencing generalized tonic-clonic seizures. Rather, he simply stated that the plaintiff "acknowledged that she was not taking all of the medication she was prescribed." AR at 29. This single sentence does not suffice as an explanation. While the criteria of Listing 11.00 are straightforward, they are also specific. If a plaintiff manifests tonic-clonic seizures while adhering to prescribed treatment for at least three months, then the Listing criteria are met. Moreover, a plaintiff's failure to adhere to prescribed medications is not automatically disqualifying; instead, the applicable regulations state that the SSA will determine whether the plaintiff "had good reason for not adhering to prescribed treatment." C.F.R. § 404 Subpt. P, App'x 1, at § 11.00(H).[3] Here, the ALJ's statement that plaintiff was not taking all of her prescribed medication is unaccompanied by any discussion regarding her reason(s) for doing so. AR at 29.

The record reflects that plaintiff had seizures every month for four consecutive months in 2016. She reported at least five seizures in January 2016, two seizures in February 2016, ten seizures in March 2016, and one seizure in April 2016. AR at 540, 478. During this period, plaintiff

---

[3] The regulations further state that "[w]e will consider you to have good reason for not following prescribed treatment if . . . you are unable to afford prescribed treatment that you are willing to accept, but for which no free community resources are available." C.F.R. § 404 Subpt. P, App'x 1, at § 11.00(H). Because this issue was not briefed by the parties, the undersigned will not make a recommendation on this basis.

visited the emergency department at least five times. An April 4, 2016, hospital record states that plaintiff "is on 100 mg of Zonegran QD for her seizures." AR at 540. The hospital notes written by Dr. Martin Adam on April 14, 2016, state that plaintiff "is complaint with her medication," and that in fact, her medication dosage had been increased two weeks prior to that hospital visit. In a phone consult with hospital staff on April 14, plaintiff's treating physician said there was no need for a medication change at that time, but that several different seizure medications had proven ineffective for her. AR at 483. No medical record from this specific period suggests noncompliance. Hospital notes from later that same month indicate that plaintiff was having breakthrough seizures despite treatment with Keppra and Zonegram. AR at 558.

It is not the role of this court to reweigh the evidence placed before the ALJ. However, here, the undersigned "simply cannot tell whether [the ALJ's] decision is based on substantial evidence." *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). The ALJ's opinion does not articulate why he discounted the plain evidence in the record of plaintiff's adherence to prescribed treatment. Indeed, it is impossible to know, based on the ALJ's opinion, whether he was aware of the legal significance of this evidence at all.

In its pleadings, the government attempts to explain what the ALJ did not. It points to the fact that plaintiff was apparently "taking cinnamon" during the January to April 2016 period at issue, a fact which goes unmentioned in the ALJ's opinion and is of unclear relevance to the question of medication compliance. (Dkt. No. 15) 7. Similarly, the government speculates about possible medical interactions with plaintiff's hormonal birth control and other medications during the spring of 2016. *Id.* Of course, nothing in Listing 11.02 requires that plaintiff remain free of interactions with other treatments. Finally, the government hypothesizes that the problem with the

13

record is that it does not contain "specificity about the duration of any such compliance," and that the evidence of compliance is based on "her own statements."[4]

The government's reliance on such speculation only serves to underscore the extent to which the ALJ failed to explain why he discounted the uncontroverted evidence in the record of medication compliance during the first quarter of 2016. No matter how persuasive the government's theories, the undersigned cannot credit them. "A reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such actions solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 169 (1962). While the government has provided many possible explanations for the ALJ's decision, none of these grounds are found in the opinion and the Court is therefore powerless to affirm the administrative action.

Accordingly, the undersigned recommends remanding the final decision of the ALJ with respect to the ALJ's failure to explain why plaintiff did not satisfy the requirements of Listing 11.02.

## V.     Recommendation

For the reasons set forth above, the undersigned recommends that plaintiff's Motion for Summary Judgment (Dkt. No. 11) be GRANTED in part, that defendant's Cross-Motion for Summary Judgment (Dkt. No. 13) be GRANTED in part, and that the final decision of defendant be REMANDED to provide the ALJ the opportunity to more specifically evaluate the evidence in

---

[4] The basis for this assertion appears to be that these statements are contained in records that also contain notations such as "history obtained from patient." AR at 478, 540. The undersigned makes no determination as to whether it logically follows that this evidence is based on plaintiff's "own statements." Moreover, by this logic, evidence of noncompliance with medication would be similarly based on plaintiff's "own statements" and thus would also be discounted.

14

the record regarding plaintiff's condition and treatment in the first four months of 2016.

## VI. Notice

The parties are notified as follows. Objections to this Report and Recommendation must be filed within fourteen (14) days of service on you of this Report and Recommendation. Failure to timely file objections to this Report and Recommendation waives appellate review of the substance of the Report and Recommendation and waives appellate review of a judgment based on this Report and Recommendation.

/s/
Michael S. Nachmanoff
United States Magistrate Judge

August 10, 2020
Alexandria, Virginia

15